J-S27003-19

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MILTON MORGAN | : | |
| | : | |
| Appellant | : | No. 236 WDA 2018 |

Appeal from the Judgment of Sentence December 21, 2017
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s): CP-02-CR-0008291-2016

BEFORE:   OLSON, J., OTT, J., and COLINS*, J.

MEMORANDUM BY OLSON, J.:                    FILED SEPTEMBER 10, 2019

Appellant, Milton Morgan, appeals from the judgment of sentence entered on December 21, 2017 in the Criminal Division of the Court of Common Pleas of Allegheny County. We affirm.

We adopt the trial court's thorough recitation of the factual background of this case. See Trial Court Opinion, 9/6/18, at 3-6. At the conclusion of trial on September 1, 2017, a jury found Appellant guilty of four counts of possession with intent to deliver a controlled substance (PWID), 35 P.S. § 780-113(a)(30), and two counts of possession of a controlled substance, 35 P.S. § 780-113(a)(16). Thereafter, on December 21, 2017, the trial court imposed an aggregate sentence of three to six years' incarceration.

Appellant filed a pro se notice of appeal on January 18, 2018. After extending the deadline in which to file his concise statement of errors

_____
*   Retired Senior Judge assigned to the Superior Court.

complained of on appeal,[1] Appellant filed a timely counseled concise statement on June 29, 2018 listing two of the three issues included in his brief to this Court. See Pa.R.A.P. 1925(b). The trial court issued its Rule 1925(a) opinion on September 6, 2018.

Appellant's brief identified three issues for our consideration.

[Whether this] case must be remanded to the [trial court] for a hearing to determine if [Appellant] intends to discontinue this appeal and file a [petition pursuant to the Post-Conviction Relief Act (PCRA), 42 Pa.C.S.A. §§ 9541-9546,] in order to effectuate [a resentencing order entered on September 25, 2018?]

[Whether the trial court] erred in denying the defense objection to Detective DeTemple's testimony that the [confidential informant] identified [Appellant] from a picture, when the [confidential informant] did not testify, and the out of court statement was clearly hearsay[?]

[Whether the assistant district attorney] committed prosecutorial misconduct during closing argument by stating that drug dealers like [Appellant] kill [confidential informants], and stating the [confidential informant's] friend died from what [Appellant] did, when neither statement was supported by any facts in evidence, and both statements were meant to cast [Appellant] in a negative light and inflame the jury, thereby depriving [Appellant] of his constitutionally guaranteed right to a fair trial and due process[?]

Appellant's Brief at 6.

Appellant's first issue arose from an unusual set of events that occurred long after he filed his notice of appeal and, indeed, after he filed his concise statement and the trial court issued its Rule 1925(a) opinion. Hence, the issue

_____

[1] Appellant requested extensions of the filing date in order to receive transcripts of the proceedings before the trial court.

is not included in Appellant's concise statement. Appellant's brief explained the events underlying this issue as follows:

> On September 25, 2018, [Appellant] appeared before [the trial court] to proceed to trial on other, unrelated criminal cases.[] [] The record reflects that [Appellant] informed the [trial c]ourt that he wanted to withdraw the [instant] appeal and instead file an "oral PCRA," [to allow the trial court] to vacate the [sentence imposed in this case] and to resentence [Appellant]. Accordingly, [the trial court] accepted [Appellant's] withdrawal of the instant appeal, granted his oral PCRA, vacated the sentence imposed on December 21, 2017, and resentenced [Appellant to two to four years' incarceration. The trial court retained] jurisdiction. [Appellant] was given credit for all time served, paroled forthwith, and interest in the underlying case closed.

Appellant's Brief at 11 (record citations omitted).

Appellate counsel concedes that she was not present for the trial court proceedings that took place on September 25, 2018. After learning what occurred, however, counsel asked Appellant to confirm whether he sought to discontinue this appeal and to take other necessary steps to effectuate the modified sentencing scheme outlined during the September 25, 2018 hearing. To date, Appellant has not responded to counsel's inquiries. Asserting that Appellant is entitled to pursue the benefits of the amended sentence imposed during the September 25, 2018 hearing, counsel requests that this case be remanded to the trial court for a hearing to address whether Appellant intends to discontinue this appeal.

For several reasons, we are unable to accede to counsel's request.[2] As a preliminary matter, absent extraordinary circumstances that permit a trial court to invoke its inherent powers to modify orders that contain patent or obvious mistakes, Pennsylvania trial courts surrender their authority to amend or rescind orders 30 days after entry or where an appeal has been lodged. See 42 Pa.C.S.A. § 5505. Section 5505 governs modification of orders and provides:

§ 5505. Modification of orders

Except as otherwise provided or prescribed by law, a court upon notice to the parties may modify or rescind any order within 30 days after its entry, notwithstanding the prior termination of any term of court, if no appeal from such order has been taken or allowed.

42 Pa.C.S.A. § 5505.

When applying § 5505 to judgments of sentence, this Court has explained:

Trial courts have the power to alter or modify a criminal sentence within thirty days after entry, if no appeal is taken. 42 Pa.C.S.A. § 5505; Commonwealth v. Quinlan, 639 A.2d 1235, 1238 (Pa. Super. 1994). Generally, once the thirty-day period is over, the trial court loses the power to alter its orders. Quinlan, 639 A.2d at 1238. When an appeal is taken, the trial court has no jurisdiction to modify its sentence. Id. We note, however, that the time constraint imposed by section 5505 does not affect

_____

[2] The certified record includes neither transcripts of the September 25, 2018 hearing nor orders reflecting the relief allegedly awarded by the trial court. As such, we are unable to confirm that the trial court took the actions described by counsel. Our analysis, therefore, should be read as reasons we reject counsel's request for remand and not a definitive determination that the trial court erred in the proceedings that occurred before it.

- 4 -

the inherent powers of the court to modify a sentence in order to "amend records, to correct mistakes of court officers or counsel's inadvertencies, or to supply defects or omissions in the record...." Id. at 1239. Therefore, where the mistake is patent and obvious, the court has the power to correct it even though the 30-day appeal period has expired. *Commonwealth v. Rohrer*, 719 A.2d 1078, 1080 (Pa. Super. 1998). It is also well-established that where a showing of fraud or another circumstance "so grave or compelling as to constitute 'extraordinary causes justifying intervention by the court,'" then a court may open or vacate its order after the 30-day period has expired. *Cardwell v. Chrysler Fin. Corp.*, 804 A.2d 18, 22 (Pa. Super. 2002).

*Commonwealth v. Walters*, 814 A.2d 253, 255-256 (Pa. Super. 2002), appeal denied, 831 A.2d 599 (Pa. 2003).

In this case, the trial court imposed sentence upon Appellant on December 21, 2017. Thereafter, the court purported to amend Appellant's sentence on September 25, 2018, approximately nine months later. As such, the court's authority under § 5505 to modify Appellant's sentence within 30 days had long since expired. In addition, the trial court lost jurisdiction to amend its sentence once Appellant filed an appeal to this Court on January 18, 2018. Lastly, there is no claim that the trial court modified Appellant's sentence to correct a patent or obvious mistake or to address a fraud. Since the court lacked jurisdiction to act, the order amending Appellant's sentence on September 25, 2018 would be null and void. See id. at 256.

Not only did the trial court lack authority to modify Appellant's sentence under § 5505, it also lacked authority to resentence Appellant by way of a collateral proceeding. Appellant did not file a written PCRA petition but instead tendered an oral request for collateral relief. Entertaining an oral request for

- 5 -

collateral relief (while a direct appeal is pending) is improper in several respects.

Rule 901 of our rules of criminal procedure governs the initiation of collateral proceedings. In relevant part, it states: "A proceeding for post-conviction collateral relief shall be initiated by filing a petition and [three] copies with the clerk of the court in which the defendant was convicted and sentenced." Pa.R.Crim.P. 901(B). The commentary to Rule 901 admonishes: "By statute, a court may not entertain a request for any form of relief in anticipation of the filing of a petition for post-conviction collateral relief." Pa.R.Crim.P. 901(B), cmt., citing 42 Pa.C.S.A. § 9545(a). Vacating Appellant's sentence by granting an oral request for collateral relief violates both the PCRA statute and the procedural rules governing collateral proceedings.

In addition, pertinent case law precluded Appellant from seeking collateral relief during the pendency of his direct appeal. It is well-settled that a petitioner who seeks collateral relief may only file a PCRA petition after he "has waived or exhausted his direct appeal rights." Commonwealth v. Williams, 2019 PA Super 225, at *1 (Pa. Super. 2019), quoting Commonwealth v. Leslie, 757 A.2d 984, 985 (Pa. Super. 2000). "If a petition is filed while a direct appeal is pending, the PCRA court should dismiss it without prejudice towards the petitioner's right to file a petition once his direct appeal rights have been exhausted." Williams, supra. The pendency

of the instant appeal thus barred Appellant from seeking collateral relief before the trial court.

As a final matter, Appellant did not follow proper procedures in attempting to discontinue this appeal through oral application before the trial court on September 25, 2018. Discontinuances of appeals pending before the Superior Court are governed by Pa.R.A.P. 1973. See Superior Court Operating Procedure § 65.23. In relevant part, Rule 1973 provides:

Rule 1973. Discontinuance

(b) Filing of discontinuance.--If an appeal has not been docketed, the appeal may be discontinued in the lower court. Otherwise all papers relating to the discontinuance shall be filed in the appellate court and the appellate prothonotary shall give written notice of the discontinuance in person or by first class mail to the prothonotary or clerk of the lower court or to the clerk of the government unit, to the persons named in the proof of service accompanying the appeal or other matter and to the Administrative Office. If an appeal has been docketed in the appellate court, the prothonotary or clerk of the lower court or the clerk of the government unit shall not accept a praecipe to discontinue the action until it has received notice from the appellate court prothonotary or certification of counsel that all pending appeals in the action have been discontinued.

Pa.R.A.P. 1973.

The certified record in this case confirms that our prothonotary's office forwarded docketing notices and statements to the trial court, Appellant, and the Commonwealth on February 21, 2018. Since this appeal was docketed well in advance of the proceedings before the trial court on September 25, 2018, all paperwork pertaining to a discontinuance of this appeal needed to be filed in this Court. Since this procedure was not followed, the events before

the trial court on September 25, 2018 had no impact on the pendency of this appeal. Thus, for each of the foregoing reasons, we reject counsel's request to remand this matter to the trial court.

We turn now to Appellant's last two issues in which he challenges the admission of certain testimony and raises claims of prosecutorial misconduct. In reviewing both of these claims, we have carefully examined the submissions of the parties, the opinion of the trial court, and the certified record on appeal. Based upon our review, we conclude that Appellant's claims are without merit and that the trial court has adequately and accurately addressed the merits of these issues. For this reason, we shall adopt the trial court's analysis as our own. The parties are hereby directed to attach a copy of the trial court's opinion to all future filings concerning our disposition of this appeal.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/10/2019

- 8 -

# IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA
## CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA,     CC No. 2016-8291

v.

MILTON MORGAN,

Defendant.                        OPINION

BETH A. LAZZARA, JUDGE
Court of Common Pleas

Copies Sent To:

Mike W. Streily, Esq.
Office of the District Attorney
401 Courthouse
Pittsburgh, PA 15219

Diana Stavroulakis, Esq.
262 Elm Court
Pittsburgh, PA 15237

FILED

2018 SEP -6 PM 3: 26

DEPT. OF COURT RECORDS
CRIMINAL DIVISION
ALLEGHENY COUNTY, PA.

App. C

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA,     CRIMINAL DIVISION

vs.                               CC No. 2016-8291

MILTON MORGAN,

Defendant.

## OPINION

This is a direct appeal from the judgment of sentence entered on December 21, 2017, following a jury trial that took place between August 30, 2017 and September 1, 2017. The Defendant was charged with four (4) counts of Possession with Intent to Deliver a Controlled Substance (35 Pa. C.S.A. §780-113(a)(30)), two (2) counts of Possession of a Controlled Substance (35 Pa. C.S.A.§780-113(a)(16)), and one (1) count of Criminal Use of a Communication Facility (18 Pa. C.S.A. §7512(a)). At the conclusion of trial, the Defendant was convicted of all six drug-related charges and acquitted of the §7512 charge. Sentencing was deferred to allow for the preparation of a Pre-Sentence Report ("PSR").

On December 21, 2017, the Defendant received an aggregate sentence of three (3) to six (6) years of imprisonment. He received 457 days of credit for time served. No post-sentence motion was filed. On January 18, 2018, the Defendant filed a *pro se*

1

Notice of Appeal. On February 13, 2018, appellate counsel was appointed to represent the Defendant. Counsel was ordered to file a Concise Statement of Errors Complained of on Appeal ("Concise Statement") pursuant to Pa.R.A.P. 1925 no later than March 6, 2018. On February 15, 2018, the Defendant filed another *pro se* Amended Notice of Appeal, which created duplicate dockets at the Superior Court of Pennsylvania. (*See* Docket Numbers 236 WDA 2018 and 253 WDA 2018). The appeal at Docket No. 253 WDA 2018 was discontinued on March 14, 2018.

After receiving two (2) extensions[1] of time, the Defendant filed a timely Concise Statement on June 29, 2018, raising the following two (2) issues for review:

1.) The Trial Court erred in denying the defense objection to Detective DeTemple's testimony that the C.I. identified Milton Morgan from a picture, when the C.I. did not testify, and the out of court statement was clearly hearsay.

2.) The Assistant District Attorney committed prosecutorial misconduct during closing argument by stating that drug dealers like Morgan kill C.I.'s and stating the C.I.'s friend died from what Morgan did, when neither statement was supported by any facts in evidence, and both statements were meant to cast Morgan in a negative light and inflame the jury, thereby depriving Morgan of his constitutionally guaranteed right to a fair trial and due process.

(Concise Statement, filed June 29, 2018, pp. 2-3).

The Defendant's allegations of error on appeal are without merit. The court respectfully requests that the Defendant's convictions be upheld for the reasons that follow.

---

[1] The Defendant was awaiting transcripts.

2

## I.   FACTUAL BACKGROUND

On May 4, 2016, Detective Thomas DeTemple of the Allegheny County Police Department – Narcotics and Vice Unit was contacted by a confidential informant ("CI") who relayed that an individual named Milton Morgan was selling heroin in Mt. Oliver and the Carrick neighborhood of the City of Pittsburgh. (Jury Trial Transcript ("TT"), 8/30/17-9/1/17, pp. 65-66, 70-71, 128-29, 191). Detective DeTemple used the Defendant's name and various databases to retrieve a picture of the Defendant in order to confirm his identity. (TT, pp. 71-72, 78-79, 192). Detective DeTemple showed the picture to the CI, and the CI positively identified the individual in the photograph as the Defendant from whom he/she had previously purchased narcotics. (TT, pp. 189-90, 192-93).

On May 5, 2016, Detective Thomas DeTemple and his partner, Detective Gary Romano, met with the CI, and together they arranged for a controlled buy to take place between the CI and the Defendant. (TT, pp. 71, 79-80, 82, 89-100, 160-61, 185). The CI called the Defendant's cell phone number and the Defendant agreed to sell the CI a bundle of heroin, which equals 10 stamp bags of heroin. (TT, pp. 80-82, 111, 162, 172, 177). The pre-arranged location for the transaction originally was the McDonald's restaurant on Brownsville Road in Mt. Oliver, and the agreed upon purchase price for the bundle of heroin was $80. (TT, pp. 82, 90, 92, 111, 171, 180).

After the CI arranged the drug transaction with the Defendant over the phone, the detectives immediately set up surveillance around the McDonald's restaurant and readied themselves for the controlled buy. (TT, pp. 90, 92, 99, 162, 171). Prior to the transaction, the detectives searched the CI for contraband with negative results. (TT, pp. 91-92, 106, 112, 169). The detectives supplied the CI with $80 in official funds to purchase the bundle of heroin. (TT, pp. 92, 111-12). Detective DeTemple conducted surveillance from his SUV while Detective Romano left the vehicle to observe the transaction from inside of the restaurant while posing as a patron. (TT, pp. 90, 93, 162). The CI went to the parking lot of the restaurant to meet the Defendant. (TT, p. 90, 162). After a few minutes, the CI returned to Detective DeTemple's vehicle, informing the detective that the location of the transaction had been changed to the 100 block of Margaret Street, which was diagonally across from the McDonald's parking lot. (TT, pp. 90-91, 94,162-63, 172-73). The detectives regrouped and set up surveillance at the new location. (TT, pp. 91, 94, 163, 173). Detective Romano and the CI walked to Margaret Street together, and Detective DeTemple remained inside of his vehicle. (TT, pp. 91, 94, 163-64, 173-74).

A few minutes later, at approximately 4:30 p.m., the Defendant was observed walking down Margaret Street towards the CI. (TT, pp. 95, 99, 113, 122, 165, 174). Detective DeTemple was parked approximately 10-15 feet away from the Defendant, and there was nothing obstructing his view of the Defendant, the CI or transaction, which took place in broad daylight. (TT, pp. 95, 111-13, 122, 182). Detective DeTemple was able to positively identify the Defendant because he had the

4

Defendant's photograph with him in his vehicle. (TT, pp. 129, 183, 190). The detectives saw the CI cross the street to meet with the Defendant. (TT, pp. 95, 165, 175-76). Detective DeTemple saw the CI hand the Defendant the $80 of United States Currency, and then he saw the Defendant hand the CI a knotted plastic baggie. (TT, pp. 96, 112-13, 132, 176). The CI then walked back towards Detective Romano while the Defendant turned around and walked back down Margaret Street in the direction from which he came. (TT, pp. 96 113). The CI had the bag in his/her hands the entire time, and the CI never placed his/her hands in any pocket. (TT, p. 166). The CI immediately handed the knotted plastic baggie to Detective Romano after approaching him. (TT, pp. 165-66, 177).

Once the Defendant left the location of the transaction, Detective DeTemple drove down Margaret Street, following the Defendant in order to determine if the Defendant was going to enter into a residence, which could have led to the issuance of a search warrant for any such residence. (TT, pp. 97, 113-14, 128-29, 167, 180). Detective DeTemple passed the Defendant twice, and he did not see the Defendant enter any house. (TT, pp. 97, 121). Detective DeTemple then stopped his surveillance of the Defendant and returned to the location of Detective Romano and the CI. (TT, pp. 98, 121, 168).

5

During the entire controlled transaction, which took no more than twenty (20) minutes from the time of the CI's phone call to the Defendant to the actual exchange, the detectives never lost sight of the CI. (TT, pp. 98-99, 112, 114-16,131, 166, 183-84). Following the transaction, the CI was searched again, at which time the detectives discovered that the plastic baggie that the Defendant had sold to the CI contained only five (5) bags of heroin/fentanyl as opposed to the ten (10) stamp bags of heroin that was originally agreed upon. (TT, pp. 96, 99, 121, 127, 166-68, 177, 180). Each of the five (5) stamp bags contained within the tied sandwich bag contained a stamp of the word "Deebo" imprinted with green ink. (TT, pp. 96, 117, 167). Based on his training and experience, Detective DeTemple believed that the Defendant had intentionally "shorted" the CI. (TT, pp. 115-17). Detective DeTemple was confident that the CI did not steal any of the drugs that had just been purchased. (TT, pp. 100, 116-17).

The detectives took the drugs back to their office, packaged the drugs as evidence, and sent the package to the Allegheny County Medical Examiner's Office for analysis. (TT, pp. 100-01, 168). The Defendant was arrested on June 28, 2016, approximately six (6) weeks after the transaction. The detectives waited this amount of time, despite the fact that the detectives knew the identity of the Defendant to protect the identity of the CI. They did not want it to be obvious to the Defendant that his arrest was the result of a controlled buy with the CI. (TT, pp. 104-05, 130).

6

## II.  DISCUSSION

### A. The defense objection to Detective DeTemple's testimony regarding the Defendant's photograph was properly overruled because the Defendant opened the door to the introduction of that evidence.

It is well-settled that "[t]he admission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion." Commonwealth v. Mitchell, 902 A.2d 430, 452 (Pa. 2006). "An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record." Commonwealth v. Cameron, 780 A.2d 688, 692 (Pa. Super. 2001).

The Defendant's first allegation of error is without merit because the Defendant opened the door to the very testimony that he had initially objected to at the beginning of trial. To be sure, Detective DeTemple never testified that the "C.I. identified Milton Morgan from a picture" during his initial testimony on direct examination. (Concise Statement, p. 2). Rather, as can be gleaned by the sequence of events relative to this testimony during the trial, Defendant's own counsel set the stage for the introduction of the now complained of evidence.

7

Detective DeTemple's direct testimony made clear that he received information from a confidential informant ("CI") that the Defendant was selling heroin in Mt. Oliver and the Carrick neighborhood of the City of Pittsburgh. (TT, p. 71). After receiving this information, the detective testified that he used "various databases" to locate a picture of the Defendant. (TT, p. 72). The Defendant's photograph was marked as Commonwealth's Exhibit 1. (Id.). As the Commonwealth was presenting the photograph to Detective DeTemple, the Defendant objected "to the admission of the testimony as it relates to that particular photo." (TT, p. 72-73). The objection was based on the assumption that the detective was going to testify that the CI identified the Defendant from the photograph. (TT, pp. 73-76). This court agreed that it would be inadmissible hearsay for the detective to testify that the CI identified the Defendant from the photograph since the CI was not available to testify at trial. (TT, pp. 74, 76). Accordingly, the court specifically barred the Commonwealth from eliciting any such identification testimony, and the Commonwealth instructed the detective to not mention any photographic identification made by the CI. (TT, pp. 74, 77).

When his direct testimony resumed, Detective DeTemple identified Commonwealth's Exhibit 1 as "a photograph [of the Defendant] that I recovered during my investigation." (TT, p. 78). The detective then made an in-court identification of the Defendant. (TT, pp. 78-79). When asked how he knew that the photo contained in Commonwealth's Exhibit 1 was a picture of the Defendant, the detective replied, "I know it's a picture of the Defendant because [of] my ability of sight. I can see that the photo is of Milton Morgan. The investigation I did also concludes that." (TT, p. 79). Detective

8

DeTemple then testified that he used the photograph during the course of his investigation to confirm the Defendant's identity. (TT, pp. 72, 79).

The only other time the photograph was mentioned during Detective DeTemple's initial testimony was during cross-examination, when defense counsel asked Detective DeTemple the following question: "[s]o in that ten seconds [of the drug transaction] you made a positive identification of [the Defendant] based on what the CI told you? Is that fair to say?" (TT, p. 129). The detective replied:

> No. No. As he approached the vehicle I was on the same side of the sidewalk. It was quite evident to me. **I had the photo next to me.** It was quite evident to me that this was Mr. Morgan approaching the confidential informant. As they did the transaction I reconfirmed my observations. As I passed him on two occasions I triple affirmed my observations that it was Mr. Morgan. (TT, p. 129) (emphasis added).

It is quite clear that at no point during his initial testimony did Detective DeTemple testify that the CI made a photographic identification of the Defendant. The entirety of the detective's testimony regarding the photograph was that it was retrieved from a database after his conversation with the CI and that it was used during the course of his investigation. (TT, pp. 78-79,129). The Commonwealth never asked any questions regarding whether the photograph was shown to the CI or whether the CI identified the Defendant from the photograph, and the detective never offered any such testimony at that time. (TT, pp. 72-79).

9

However, during the re-cross-examination of a different detective on the case, Detective Gary Romano, defense counsel pursued a line of questioning regarding the CI's identification of the Defendant from the photograph. During this questioning, defense counsel elicited the very testimony to which he had objected earlier. (TT, pp. 184-85). Defense counsel specifically asked Detective Romano whether Detective DeTemple showed the Defendant's photograph to the CI during their briefing and whether the CI identified the Defendant from the photograph. (TT, pp. 184-85). Detective Romano testified that he did not know whether the CI identified the Defendant from the picture, but that he did ultimately become aware that the CI identified the Defendant. (TT, p. 185).

As a direct result of the Defendant's line of questioning on the issue of the photographic identification, questioning that essentially "opened the door" to the CI's photographic identification, the Commonwealth informed the court that it wished to recall Detective DeTemple to "talk about the identification on the photo." (TT, p. 187). Defense counsel specifically stated that he was "not objecting" to that testimony. (TT, p. 187). The Commonwealth clarified that its examination of Detective DeTemple would include questions about "how the CI would be able to identify" the Defendant, and defense counsel objected at that point. (TT, p. 187). The court substantially restricted the scope of the Commonwealth's examination, ruling that the Commonwealth could only "recall [Detective DeTemple] to ask him if he showed the picture and if [the CI] identified the picture as Milton Morgan." (TT, p. 188). Defense counsel made no further objection after the court's ruling. (TT, pp. 188-89).

10

When Detective DeTemple was recalled to the stand, the Commonwealth presented him with the Defendant's photograph (Commonwealth's Exhibit 1) and asked whether he had shown that particular picture to the CI. (TT, pp. 189-90). The detective confirmed that he did, in fact, show the photograph CI, and he also stated that the CI identified the person in the photograph as the Defendant. (TT, pp. 189-90). Detective DeTemple also testified that the CI identified the Defendant as someone from whom he/she had previously purchased drugs. (TT, p. 190). Detective DeTemple further testified that the photograph was the same one that he had next to him in his vehicle during the controlled buy and that he had used that same photo to confirm the Defendant's identity during the transaction. (TT, p. 190). There were no defense objections to any of this testimony elicited during the direct examination of the detective on recall. (TT, pp. 189-91). On cross-examination during the recall testimony, defense counsel asked questions about the details of the identification and did not make any further objections to Detective DeTemple's testimony regarding the CI's photographic identification of the Defendant. (TT, pp. 191-94).

Against this backdrop, it is clear that the Defendant's first allegation is completely lacking in merit. This court initially ruled in the Defendant's favor and precluded the Commonwealth from eliciting any testimony which related to the CI's photographic identification of the Defendant. However, the Defendant later "opened the door" to the very testimony he had initially sought to bar. Further, he did not lodge any objections to it at that time. Even after he had opened the door to the admission of this evidence, this court substantially limited the scope of the testimony regarding the photographic

11

identification. Accordingly, the Defendant falls well short of proving that this court abused its discretion in allowing the Commonwealth to clarify certain details regarding the photograph after the Defendant's own questioning paved the way for the introduction of that evidence.

To the extent that the Defendant's first contention also implicates the detective's testimony in which he related that the CI named the Defendant as a heroin dealer, the court notes that counsel did not raise a timely objection to that aspect of the detective's testimony. (TT, pp. 71-72). The objection that was made was to the "admission of the testimony as it relates to that particular photo" because the "person who made the identification of that photo is unavailable to substantiate making the identification." (TT, pp. 72-73). As part of his argument, counsel then later realized he never made an objection to the Defendant's name and attempted to place the objection on the record well after the jury had already heard that evidence. (TT, pp. 75-78).

Counsel is required to make *timely* objections. Pa.R.E. 103(a). Failure to do so prevents the court from restricting inadmissible evidence from the hearing of the jury and waives the complaint about the admission of that evidence. *See* Pa.R.A.P. 302(a). Here, the objection was not timely made, and, therefore, should be deemed waived. In any event, even if counsel had made a timely objection to the CI providing the Defendant's name to the detective, the court would have overruled the testimony because it would have been admissible under the course of conduct exception to

12

hearsay. Commonwealth v. Cruz, 565, 414 A.2d 1032, 1035 (Pa. 1980) ("[A]n out-of-court statement offered to explain a course of conduct is not hearsay."). The fact that the CI named the Defendant as a drug dealer was not being offered for the truth of the matter, but rather to explain the actions that the detectives later took as a result of their conversation with the CI.

Moreover, even if this court erred in allowing the testimony in which the CI named the Defendant as a heroin dealer, the admission of that testimony was harmless error. Commonwealth v. Mitchell, 902 A.2d 430, 452 (Pa. 2006) ("[A]n erroneous ruling by a trial court on an evidentiary issue does not require us to grant relief where the error is harmless."). "An error will be deemed harmless where the appellate court concludes beyond a reasonable doubt that the error could not have contributed to the verdict. If there is a reasonable possibility that the error may have contributed to the verdict, it is not harmless. In reaching that conclusion, the reviewing court will find an error harmless where the uncontradicted evidence of guilt is overwhelming, so that by comparison the error is insignificant." Mitchell, supra, 452 (quoting Commonwealth v. Isaac Mitchell, 839 A.2d 202, 214–15 (Pa. 2003). The Commonwealth bears the burden of demonstrating harmless error. Commonwealth v. Mayhue, 639 A.2d 421, 433 (Pa. 1994).

Indeed, even though the CI named the Defendant as a drug-dealer, the fact remains that a controlled buy was conducted *following* the detective's receipt of this information during which the Defendant was directly observed by the officers selling the

13

CI a prearranged amount of heroin at a prearranged location for a prearranged sum of money. Notwithstanding the fact that the officers had received the Defendant's name from a third party who did not testify at trial, they conducted a further investigation into the matter and specifically observed the Defendant engage in a drug sale, which renders the inadmissible hearsay harmless. *Cf.* Commonwealth v. Dent, 837 A.2d 571 (Pa. Super. 2003) (holding that the police officer's testimony that he had obtained a photograph of the defendant based upon a conversation in which the defendant's sister identified him by name as the person fleeing the scene of the crime constituted inadmissible hearsay). Unlike the situation in Dent, *supra*, the challenged statement did not, in and of itself, lead to the Defendant's arrest. Rather, it merely initiated an investigation that culminated in a controlled buy where officers were able to specifically corroborate the statement with observed criminal activity. Based on these facts, the challenged statements were *not* "likely to be understood by the jury as themselves proving the elements of the crime for which the defendant was charged." Dent, *supra*, at 579 (citing Commonwealth v. Palsa, 555 A.2d 808 (Pa. 1989).

Accordingly, for all of the reasons just stated, the Defendant's first allegation of error on appeal should be rejected as meritless because he cannot demonstrate that this court abused its discretion with respect to its ruling on the photographic identification issue.

**B. The allegation of prosecutorial misconduct is waived for lack of objection at the time of trial. However, even if waiver is not found, the issue lacks merit because the comments were fairly based on the evidence and the inferences that properly could be drawn therefrom.**

The Defendant's second allegation of error on appeal should be deemed waived because the Defendant never raised an objection to the Commonwealth's statements that were made during closing arguments. (TT, pp. 231-35, 280). "The failure to raise a contemporaneous objection to a prosecutor's comment at trial waives any claim of error arising from the comment." Commonwealth v. Powell, 956 A.2d 406, 423 (Pa. 2008) (citing Pa.R.A.P. 302(a), which states that "[i]ssues not raised in the lower court are waived and cannot be raised for the first time on appeal"); Commonwealth v. Myers, 489 A.2d 900, 906 (Pa. Super. 1985) ("Failure to make a timely objection to allegedly improper conduct of the prosecutor acts as a waiver of the claim of error.").

Even if the Defendant's claim is not deemed waived, it nevertheless lacks merit. The standards governing challenges to statements by the prosecutor are well-settled:

> A prosecutor has reasonable latitude during his closing argument to advocate his case, respond to arguments of opposing counsel, and fairly present the Commonwealth's version of the evidence to the jury. A challenged statement by a prosecutor must be evaluated in the context in which it was made. Not every intemperate or improper remark mandates the granting of a new trial. Reversible error occurs only when the unavoidable effect of the challenged comments would prejudice the jurors and form in their minds a fixed bias and hostility toward the defendant such that the jurors could not weigh the evidence and render a true verdict.

Commonwealth v. Ali, 10 A.3d 282 (citing Commonwealth v. Cooper, 941 A.2d 655, 668 (2007) (citations omitted). Prosecutorial remarks are not objectionable if the

15

remarks "were based on the evidence or proper inferences therefrom...."

Commonwealth v. Jones, 811 A.2d 994, 1006 (Pa. 2002). However, the prosecutor should not "misstate the evidence or mislead the jury as to the inference it may draw." Commonwealth v. Shain, 426 A.2d 589, 591–92 (Pa. 1981).

Contrary to the Defendant's contention, the Commonwealth's statements during closing arguments were based on the evidence and the proper inferences that could have been drawn therefrom. With respect to the comment about how "drug dealers like Morgan kill C.I.'s," the court notes that the jury heard evidence about the importance of maintaining the confidentiality of the informants in order to keep them safe and prevent their dealers from ascertaining their identity. (TT, pp. 70, 94, 104-05, 231).

Indeed, during his testimony, Detective DeTemple testified that the "whole idea behind the confidential informant is the confidentiality. Keep them safe, keep them hopefully out of the picture." (TT, pp. 70, 94). The testimony about the purposes of delaying the arrest of a drug-dealer also relayed to the jury that a CI's safety could be compromised if drug dealers were able to ascertain the identity of the individual(s) who set them up. To complete the picture, there was testimony about the use of a CI, and there was certainly ample evidence, presented through the testimony regarding the circumstances of the controlled buy, that the Defendant was a drug-dealer. Accordingly, the Commonwealth's statements that drug-dealers like the Defendant pose a threat to the safety of confidential informants was a fair comment based on the

16

evidence that had been presented to the jury and the inferences that the jurors could draw from that evidence. The Commonwealth did not misstate the evidence or mislead the jury as to the evidence in any way, and the comment was largely in response to the Defendant's closing argument wherein defense counsel suggested to the jury that the "biggest hole" in the case was the absence of the informant at trial and the Defendant's inability to question the informant about what happened. (TT, pp. 211-12, 221, 227). Thus, the Commonwealth's comment was made in the context of explaining the importance of maintaining the secret identity of the informant in order to keep him/her alive and safe since the defense made the absence of the CI at trial an issue. (TT, pp. 230-32).

With respect to the Commonwealth's comment about how the "CI.'s friend died from what Morgan did," Detective DeTemple testified that it was his belief that the CI was motivated to engage in the controlled buy with the Defendant because the CI's friend had died from drugs that were purchased from the Defendant and that the CI wanted to prevent another death from occurring. (TT, pp. 109-10). Detective DeTemple also testified that heroin and fentanyl are dangerous and lethal substances. (TT, pp. 102-04). Accordingly, the jury was presented with evidence that supported the Commonwealth's comment during closing argument. The court further notes that any prejudice which may have resulted from these comments was minimal in light of the very consistent and credible testimony regarding the controlled purchase that the Defendant engaged in with the CI. As has been stated earlier, law enforcement officers directly observed the Defendant engage in a prearranged drug transaction, at a

17

prearranged time and place, for a prearranged sum of money, wherein he ultimately sold 5 stamp bags of heroin and fentanyl to a CI. The detectives testified numerous times that between the both of them never lost sight of the CI, and they retrieved the drugs from the CI immediately after the transaction was over. Thus, given the strength of the evidence presented against the Defendant at trial, the Commonwealth's comment had little, if any, prejudicial effect on the Defendant.

## III.   CONCLUSION

For all the reasons just stated, the Defendant's contentions on appeal are without merit. This court did not abuse its discretion at trial. The alleged prosecutorial misconduct was waived for failure to object, and any claim of prejudice therefrom is meritless in any event.

BY THE COURT:

_____, J.
BETH A. LAZZARA, JUDGE

9/6/18
DATE

18